# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Daniel A.,

        Plaintiff,

        v.

Andrew Saul, Commissioner of Social
Security

        Defendant.

Case No. 17-cv-4322 (ECW)

**ORDER**

This matter is before the Court on Plaintiff Daniel A.'s ("Plaintiff") Motion for

Summary Judgment (Dkt. 24) ("Motion") and Defendant Commissioner of Social

Security Andrew Saul's ("Defendant") Cross-Motion for Summary Judgment (Dkt. 25)

("Cross-Motion").  Plaintiff, proceeding pro se, filed this case seeking judicial review of

a final decision by Defendant denying his application for disability insurance benefits.

For the reasons stated below, Plaintiff's Motion is denied, and Defendant's Cross-Motion

is granted.

## I.      <u>BACKGROUND</u>

Plaintiff filed an application for benefits under Title II of the Social Security Act

(42 U.S.C. §§ 416(i) & 423) on June 17, 2014, claiming that he has been disabled since

March 1, 2011 due to back and neck problems.  (R. 25, 413).[1]  Plaintiff's application was

denied initially (R. 340, 353-55) and on reconsideration (R. 350-51, 363-64).  Plaintiff

---

[1]      The Administrative Record can be found at Docket No. 19.

requested a hearing before an administrative law judge (R. 367), which was held on April 15, 2016 before Administrative Law Judge ("ALJ") Mary M. Kunz. (R. 25.) Plaintiff was represented by legal counsel at the hearing before the ALJ. (R. 312.) The ALJ issued an unfavorable decision on May 4, 2016. (R. 25, 33.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a), the ALJ determined that Plaintiff last met the insured status requirements for the Social Security Act on December 31, 2011.[2] (R. 27.) The ALJ went on to determine that Plaintiff had not engaged in substantial gainful activity since April 1, 2011, the alleged onset date, through the last date of insured of December 31, 2011. (*Id*.)

At step two, the ALJ determined that Plaintiff had the following severe impairments at the date last insured: asthma, degenerative disc disease of the lumbar spine with L5-Sl laminotomy and discectomy on April 27, 2011 and revision on October 12, 2011. (*Id*.) The ALJ determined that Plaintiff's other physical impairments were not severe during the period Plaintiff was insured:

> Many other impairments in the record were not diagnosed and thus not established as medically determinable impairments until long after the date last insured. Specifically, the claimant testified to the inability to do his past work because of neck pain and left arm tingling. Imaging in April 2012 confirmed moderate degenerative disc disease, but no evidence of nerve root involvement. (Exhibit 1F, at pages 13- 14) The record indicates that he did not seek evaluation of these symptoms until April 4, 2012, four months after the date last insured. At that time, the physical examination indicated he had tenderness to palpation and decreased range of motion of the cervical and lumbar spine but negative straight leg raising, normal strength and sensation, and normal tendon function in the hand. (Exhibit 1F, at pages 9-10) There was little follow-up of this condition until March 5, 2013, when the claimant complained to Dr. Santos of neck and arm pain for the past three months and,

---

[2]     Plaintiff does not dispute his date last insured. (Dkt. 24 at 2.)

for the first time, the physical examination indicated he had decreased sensation over the ulnar aspect of the left forearm.  (Exhibit 1F, at page 11)  Unlike in March 2013, there are no clinical findings or even complaints of symptoms to support a finding that this was a severe impairment on or prior to the date last insured.  (See Exhibit 4F, at pages 6-7, 9-10, Exhibit 5, at page 25).

(R. 27-28.)

At the third step, the ALJ determined that through the date of last insured Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 28.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"): "perform light work, as defined in 20 CFR 404.1567(b),[3] except further limited by no more than occasional bending, stooping, kneeling, crouching, crawling, or climbing, and should not involve exposure to high concentrations of air pollutants."  (R. 28.)  Based on this RFC, the ALJ determined that

---

[3]     Pursuant to the Social Security regulations, light work is defined as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Plaintiff was capable of past relevant work as a telemarketer and phone order clerk, which the vocational expert ("VE") testified that a hypothetical individual with the determined RFC could perform, especially in light of the fact that the positions are sedentary in nature.[4]  (R. 32.)

Accordingly, the ALJ found Plaintiff not disabled.  (R. 32.)

Plaintiff requested review of the decision.  (R. 1.)  The Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner.  (*Id.*)  Plaintiff then commenced this action for judicial review.  The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    RECORD

On November 9, 2010, Plaintiff underwent an assessment for physical therapy.  (R. 231.)  Plaintiff reported an onset of the lower back pain approximately 15 years earlier with lifting.  (*Id.*)  He seemed to get over that in time, but noted that flare-ups

---

[4]    Pursuant to the Social Security regulations, sedentary work is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

began about three years later, which seemed related to a desk job and decreased activity level.  (*Id.*)  Flare-ups were occurring more often and would last for 1-2 weeks.  (*Id.*)  They were triggered by activities such as yard work.  (*Id.*)  Plaintiff reported feeling pain daily, even between flare-ups.  (*Id.*)  His last big flare-up occurred approximately six months earlier.  (*Id.*)  The flare-ups would limit bending.  (*Id.*)  The pain was rated at 0 to 5 out of 10.  (*Id.*)  He denied radicular symptoms.  (*Id.*)  The pain was described as aching and it was intermittent.  (*Id.*)  Plaintiff's lifting was limited to about 60 pounds.  (*Id.*)  Plaintiff avoided full bending and had some pain dressing.  (*Id.*)  Plaintiff was prescribed with manual therapy and exercises to improve flexibility, strength, and function.  (R. 233.)  Plaintiff did not schedule the prescribed physical therapy sessions.  (R. 235.)

On April 1, 2011, Plaintiff reported to an urgent clinic with back pain.  (R. 166.)  Plaintiff noted that the symptoms began a "day(s) ago . . . ."  (*Id.*)  His history of back pain was reported as "recurrent self limited episodes of low back pain in the past."  (*Id.*)  The pain was exacerbated by bending and changing position.  (*Id.*)

On April 14, 2011, Plaintiff had an MRI performed on his lumbar spine.  (R. 39.)  The imaging report noted that Plaintiff had "[l]ow back pain, sciatica.[5]  Less than six-week history."  (*Id.*)  The MRI showed that the lumbar vertebral bodies were in normal anatomic alignment, but that there were multilevel degenerative changes, most notably at L5-S1, with a disc protrusion causing moderate to severe narrowing of the spinal canal

---

[5]     Sciatica: "Pain in the lower back and hip radiating down the back thigh into the leg . . . ."  STEDMAN'S MEDICAL DICTIONARY, 1731 (28th ed. 2006).

and impinging upon the bilateral descending S1 nerve roots.  (R. 39-40.)  Plaintiff was diagnosed with left L5-S1 herniated nucleus pulposus and left S1 radiculopathy.  (R. 43.) He had exhausted nonoperative measures and continued to have unspecified significant symptoms.  (R. 44.)

On April 22, 2011, Plaintiff saw Jacqueline A. Geissler, M.D. for a surgery consult.  (R. 655.)  Plaintiff had reported a one-month history of severe back pain which was exacerbated by movement with pain going down his left side to the plantar aspect of his foot and his heel.  (*Id.*)  Plaintiff represented that his pain was constant and became worse with certain movements or positions, although there was no position which relieved or improved this pain.  (*Id.*)  Plaintiff rated his back pain at a level of 9 or 10. (*Id.*)  His past medical or surgical history made no mention of neck problems.  (*Id.*) Plaintiff had pain exacerbated with movement in general, a nonantalgic gait, he was able to heel walk, toe walk, and squat and rise with good execution, although it was uncomfortable.  (R. 656.)  Given the MRI and his symptoms, Dr. Geissler believed it would be reasonable to proceed with a surgical intervention.  (*Id.*)

On April 27, 2011, Plaintiff had the following surgical procedures performed on outpatient basis: microscopic laminotomy of left L5-S 1; microscopic partial discectomy, left L5-S1; and microscopic left S1 nerve foraminotomy.  (R. 43.)  The post-operative plan was for Plaintiff to mobilize as tolerated, he was sent home with Percocet, which he was to take as needed for pain, and was to be seen back in the clinic in six weeks' time. (R. 44.)

Plaintiff's pain had resolved, however, he had a reoccurrence of pain in August 2011. (R. 55.) On August 30, 2011, Plaintiff had another MRI related to low back pain and possible left leg radiculopathy. (R. 46.) The MRI showed a large recurrent central to slightly left central L5-S1 disc herniation resulting in severe central and left subarticular stenosis,[6] a moderate bilateral foraminal stenosis, and stable L4-L5 degenerative disc disease with moderate central and bilateral foraminal stenosis. (R. 47.)

On September 16, 2011, Plaintiff saw Edward Santos, M.D., related to his back pain. (R. 48.) Plaintiff represented that he had been doing well since his surgery until a few weeks prior to his visit, when he started to have recurrent low back pain. (*Id.*) While the MRI showed a recurrent herniation, Plaintiff represented that his pain was manageable with 1-2 Vicodin per day. (*Id.*) Dr. Santos found as follows: "I spoke with Daniel **and given his mild picture**, I have advised continued nonoperative treatment. If upon discontinuation of the Vicodin and with more activities his pain escalates, then I have recommended performing a revision microdiskectomy. He will call us over the next few days and update us and we will then plan accordingly." (R. 48-49 (emphasis added).)

As the result of continuing symptoms and the exhaustion of nonoperative measures, Plaintiff underwent a revision left L5-S 1 laminotomy, revision left microscopic L5-S1 microdiskectomy, and revision left L5-S1 nerve decompression on October 12, 2011. (R. 52-53.) Dr. Santos provided that the post-operative plan was to

---

[6]     Stenosis: "A stricture of any canal or orifice." STEDMAN'S MEDICAL DICTIONARY, 1833 (28th ed. 2006).

have Plaintiff mobilize as tolerated. (*Id.*) He was restricted from bending, lifting more than ten pounds, and twisting for six weeks. (*Id.*)

Plaintiff next saw a medical provider on December 13, 2011. According to Jess Brehmer, M.D.:

> Since the surgery in 10/2011, the patient reports he has been doing well. He has been on unemployed even before his 1012011 surgery thus, he states he has not been doing "anything." The patient states he has not been working. He also reports that he is not doing anything in the way of physical activities including yard work or any shoveling just because he has been afraid and cautious to reinjure his back. Ultimately though, he is doing well. He is not having any issues with pain, denies any radicular symptoms, denies any weakness in the lower extremities and denies any numbness or tingling.

(R. 61.) It was noted that the radiography showed "normal alignment" and only mild degenerative disk disease at L5-S1. (R. 61-62.) The physical examination showed that Plaintiff's strength was 5/5 in his lower extremities; he had an intact sensation from the L3-S1 dermatomes bilaterally; his straight leg raise was negative; and he was able to walk without difficulty. (R. 61.) The assessment and plan for Plaintiff was as follows:

> We discussed with Mr. [A.] that at this point, there are no changes noted on his imaging studies. Clinically, he looks to be doing well. From our standpoint, he can advance his activities as tolerated. We did discuss that he is likely deconditioned with regards to his musculature; thus, we recommend he do exercises as he previously had been taught at physical therapy. He does have the list of these exercises and is willing to go forth and start these up. We did discuss with him the importance of practicing good back health with regards to posture. From this standpoint, he can be doing activities as tolerated and we can see him back in clinic on an as needed basis.

(R. 62.) Both Dr. Brehemer and Dr. Santos agreed on this plan. (*Id.*)

On December 13, 2011, Dr. Santos reviewed an MRI from the same date. (R. 645.) Dr. Santos's assessment was "Normal alignment, no acute bony changes noted, mild degenerative disc disease, L5-S1." (*Id.*)

During the hearing before the ALJ, Plaintiff admitted that he went back to work after the second surgery as follows:

> Q    Okay. Right, and then after you had the second one, why couldn't you have gone back to work?
>
> A    **<u>Well I actually did</u>** that's when my neck started to hurt and we did some -- I believe we did physical therapy in 2012.
>
> Q    Okay.
>
> A    I don't know. I can't --
>
> Q    Okay.
>
> A    -- recall.

(R. 317 (emphasis added).)[7]

Between May 2011 and October 2011, Plaintiff's Physician's Assistant ("PA"), Matthew Luther, issued opinions that Plaintiff was suffering from lower back pain and checked a box representing that "Patient will not be able to perform any employment in

---

[7]    Plaintiff asserts that this line of questioning was a "personal attack" by the ALJ. (Dkt. 24 at 3.) In order for a plaintiff to prove that an ALJ exhibited unacceptable conduct towards him, he is "required to show that the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'" *Perkins v. Astrue*, 648 F.3d 892, 903 (8th Cir. 2011) (quoting *Rollins v. Massanari*, 261 F.3d 853, 858 (9th Cir. 2001)) (citation omitted). The Court concludes that this line of questioning regarding why Plaintiff did not go back to work in December 2011 was appropriate given the positive reports by his medical providers during this period, especially given the limited period that Plaintiff was insured.

the foreseeable future." (R. 537-44.) PA Luther did not set forth how the chronic lower back pain affected Plaintiff's ability to work. In addition, there was no mention of Plaintiff suffering from any neck pain during this period. (*Id*.) PA Luther only first mentioned that Plaintiff could not work due to his neck pain in November 2012. (R. 545.)

On April 4, 2012, Plaintiff sought care for cervical pain. (R. 524.) Plaintiff presented with both back and neck pain. (*Id.*) Plaintiff characterized the pain as moderate and severe aching, discomfort, and increased pain with activity. (*Id.*) Plaintiff rated the pain at 6/10 at its worst and 2/10 at its best. (*Id*.) Plaintiff's muscles were tender on palpation in the cervical and lumbar regions. (R. 525.) Flexion and extension were decreased. (*Id.*) Leg raises produced a negative result, and Plaintiff's strength and nerve sensation were normal. (*Id.*) Plaintiff's x-rays showed a loss of cervical lordosis[8] and a prior lumbar surgery. (*Id.*, R. 528.) Tilok Ghose, M.D., assessed Plaintiff with chronic cervical radiculopathy, neck pain, and low back pain radiating into both legs. (R. 525.) A subsequent MRI showed moderative degeneration changes in the cervical spine, cervical disc bulging with mild to moderate canal stenosis, and no cervical cord compression or signal abnormality. (R. 529.) The lumbar MRI showed no reoccurring disk herniation at the L5-S1 level and a disk bulge at the L5-S1 and L4-5 discs. (R. 531.)

On December 4, 2012, Plaintiff sought care for cervical pain from a physical therapist. (R. 238.) The physical therapist noted that this was "a new condition" with

_____

[8]        Lordosis: "An anteriorly convex curvature of the vertebral column . . . ." STEDMAN'S MEDICAL DICTIONARY, 1119 (28th ed. 2006).

pain being intermittent over the past year. (*Id.*) Plaintiff reported that "[t]wo months ago had flare up of neck and arm symptoms possibly from moving his ladder. Had a tooth pulled June 2012 which he feels increased his [symptoms]." (*Id.*) As it related to his back, Plaintiff reported that he had no left leg symptoms (except for his leg feeling shaky) and only left lower back pain since his surgery. (*Id.*) Plaintiff characterized his pain as aching and intermittent, and reported that his level of pain was in a range in between 5/10 to 9/10. (*Id.*) His symptoms were exacerbated by lifting and walking, and relieved by rest. (*Id.*) Plaintiff was prescribed with an in-home treatment program and physical therapy appointments. (*Id.*)

On February 8, 2013, Plaintiff reported back to the physical therapist. (R. 248.) Plaintiff had shoveled snow over the weekend and had a flare-up of neck and back pain. (*Id.*) Plaintiff had failed to do his home exercises and had not attended his physical therapy appointments. (*Id.*) His pain level during the appointment was 3 out of 10. (*Id.*) Plaintiff was discharged for failing to complete his ordered appointments. (*Id.*)

On March 5, 2013, Dr. Santos saw Plaintiff related to his neck and left arm pain. (R. 66.) Plaintiff reported having this pain for the past 3 months, which was exacerbated by physical therapy. (R. 66.) An MRI of the cervical spine showed C3-4 left-sided foraminal stenosis, as well as C5-6 bilateral foraminal stenosis. (R. 67, 626.) The diagnosis by Dr. Santos was "degenerative disk disease of the cervical spine with C5-6 bilateral foraminal stenosis." (R. 67.) No mention was made of back pain and Plaintiff demonstrated a normal gait. (*Id.*) Plaintiff underwent a cervical nerve root injection with no effect. (R. 70.)

On August 27, 2013, Plaintiff reported good, but only temporary relief with a root injection. (R. 627.) Plaintiff was not in any acute distress on examination, he demonstrated a normal gait, he had a good range of motion for his cervical spine and had full-strength in his upper extremities. (*Id.*) Dr. Santos believed it was reasonable to consider surgery in the form of a C5-6 anterior discectomy and fusion. (*Id.*)

On October 10, 2013, Plaintiff underwent surgery related to cervical degenerative disk disease with disk herniation. (R. 78-80.) The preoperative examination made no mention of Plaintiff's lumbar condition and it was not listed on his active problem list. (R. 83, 88.)

On April 4, 2014, Plaintiff reported back, lower extremity, and neck pain. (R. 104.) It was reported that Plaintiff had a history of two previous micro discectomies at the L5-S1 level "**but of late** he has been having increasing low back pain and left lower extremity pain." (*Id.* (emphasis added).) It was noted that Plaintiff had been shoveling snow and working on plumbing. (*Id.*) An April 18, 2014 MRI showed no recurrence of disk herniation in the lumbar region. (R. 106.) The diagnosis as it relates to Plaintiff's back, was "**onset** low back pain secondary to degenerative disease of L5-S1." (R. 107 (emphasis added).)

On April 8, 2014, Plaintiff reported that his neck pain was improved. (R. 634.) His main complaint was lower back pain. (*Id.*) He claimed to be suffering from increased lower back and extremity pain. (*Id.*) Plaintiff did not to appear to be in any acute distress. (*Id.*) He showed a limited range in the lumbar region. (*Id.*)

On April 14, 2014, state agency physician Cliff Phibbs, M.D., assessed Plaintiff's limitations for the period of disability of April 1, 2011 through December 31, 2011. According Dr. Phibbs, Plaintiff could occasionally lift or carry 20 pounds and frequently lift 10 pounds. (R. 338.) In addition, Plaintiff could sit and/or stand with normal breaks for 6 hours out of an 8-hour workday. (*Id.*) Dr. Phibbs concluded that Plaintiff could occasionally: climb stairs and ladders, balance, stoop, kneel, crouch and crawl. (*Id.*) Plaintiff had no manipulative, visual, communicative or environmental limitations. (*Id.*) Dr. Phibbs found that Plaintiff had the requisite RFC to perform his past jobs. (R. 339.) Dr. Phibbs noted that Plaintiff only had restrictions related to lumber issues, as Plaintiff's cervical issues began after the last date insured. (R. 338.) On reconsideration, Charles Grant, M.D., found the same limitations for Plaintiff as those assessed by Dr. Phibbs. (R. 347-49.)

On July 15, 2014, Plaintiff reported increasing pain in his back over the "past several months." (R. 108.) It was also noted that Plaintiff had underwent a cervical fusion in October 2013. (*Id.*) While Plaintiff represented that his arm problems had resolved, he continued to have neck pain and his back was significantly worse. (*Id.*) The physical examination showed that Plaintiff was not in acute distress, he ambulated with a normal gait, had an intact sensation in the lower extremities, and had full strength in the L2 to S1 nerve distributions. (*Id.*) An MRI of the lumbar spine showed significant loss of disk height at the L5-S1 level with a disk bulge posteriorly and some central canal narrowing. (R. 109.) Dr. Peterson and Plaintiff agreed to proceed with a L5-S1 fusion. (*Id.*) There is no indication that the surgery ever took place because his insurance would

not pay for it unless Plaintiff underwent a certain amount of physical therapy, which Plaintiff refused due to pain.  (R. 201, 638.)

Plaintiff continued to have treatment of his cervical and lumbar pain during 2015 (R. 115, 201.)  Plaintiff's treatment included cervical injections and a cervical fusion, and he treated with pain medications for his back pain.  (R. 118-125, 137-38, 743-47, 755-57.)  Plaintiff also continued to complain about neck pain and extremity pain in 2016. However, Dr. Santos could not identify anything structural on the MRIs of the cervical spine or physiological issues that could explain his symptoms from a spine standpoint. (R. 149.)

In a March 3, 2016 neurology report, it was noted that Plaintiff represented that his "[p]ain in neck and arm first started in 2012, no inciting incident."  (R. 151.)

### III.   LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law.  *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions."  *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.*  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it

would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.*

"In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status." *See Pyland v. Apfel*, 149 F.3d 873, 876–77 (8th Cir. 1998); *see also* 42 U.S.C. 416(i)(3); 20 C.F.R. § 404.130; *Rasmussen v. Shalala*, 16 F.3d 1228 (8th Cir. 1994) ("To qualify for disability benefits, Rasmussen had to prove that, on or before the expiration of his insured status, he was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which was expected to last for at least twelve months or result in death.") (citation omitted). A non-disabling condition, which later develops into a disabling condition after the expiration of a claimant's insured status, cannot be the basis for an award of disability benefits under Title II. *See Thomas v. Sullivan*, 928 F.2d 255, 260-61 (8th Cir. 1991). It is not enough that the impairments existed before the date a claimant's insured status expired; the impairments must have been disabling at that time. *See* 20 C.F.R. § 404.131(a). Evidence of a disability subsequent to the expiration of one's insured status can be relevant, however, in helping to elucidate a medical condition during the time for which benefits might be rewarded. See *Pyland*, 149 F.3d at 877 (citing *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989)).

Plaintiff was insured through December 31, 2011 (R. 25); therefore, he must show that his disability began before the end of his insurance period, and existed for twelve continuous months to receive benefits. *See* 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a).

# IV.   DISCUSSION

Plaintiff makes several challenges to the ALJ's determination.  First, Plaintiff argues that the ALJ erred in finding that he did not have severe impairments related to his neck during the period in which he was insured.  (Dkt. 24 at 2, 4.)  Second, Plaintiff argues the ALJ erred by not giving weight to PA Luther's opinion that he was unable to work, including on the basis that Luther was a PA.  (*Id.*)  Third, Plaintiff argued that the ALJ erred in finding that his degenerative disc disease, which has no cure, was not an ongoing disabling problem through 2011 and beyond, and would not have allowed him to work for more than 2-3 hours a day in 2011.  (*Id.* at 3.)  Fourth, Plaintiff argued that he could not perform the tasks necessary to be a telemarketer at Best Buy because the sales goals require someone to be calling 8 hours per day, which does not allow for accommodations that would allow him to get up and walk or otherwise rest.  (*Id.*) Plaintiff also asserted that the Vocational Expert ("VE") testified that he could not work with a 15% disability, which he asserts the ALJ did not consider.  (*Id.* at 2-4.)  According to Plaintiff there is not one telemarketing job that allows for a telemarketer to be in any position but a sitting position for at least 8 hours, no employer would provide him with a sit/stand desk, and a sit/stand option was not sufficient for him as he also needed to rest due to pain.  (*Id.*)  The Court addresses each argument in turn.

## A.   The ALJ's Decision that Plaintiff's Cervical Problems Were Not a Severe Impairment During the Period Insured.

Having fully reviewed the record, the Court finds that there is substantial evidence in the record as a whole to support the decision of the ALJ that Plaintiff did not have a

severe impairment related to his neck during the period in which he was insured.  At Step

Two of the sequential analysis, the ALJ is required to determine whether a claimant's

impairments are severe.  *See* 20 C.F.R. § 404.1520(c).  While "severity is not an onerous

requirement for the claimant to meet . . . it is also not a toothless standard."  *Wright v.*

*Colvin,* 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted).  An impairment is not

severe if it amounts only to a slight abnormality that would not significantly limit the

claimant's physical or mental ability to do basic work activities.  *See Bowen v. Yuckert*,

482 U.S. 137, 153 (1987).  If the impairment would have no more than a minimal effect

on the claimant's ability to work, then it does not satisfy the requirement of step two.  *See*

*Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (citations omitted).  Further, "[t]o

support the award of disability benefits, a disease must have progressed from latency to a

level constituting severe impairment as defined under Title II **before the expiration of**

**the insured period**."  *List v. Apfel*, 169 F.3d 1148, 1149 (8th Cir. 1999) (emphasis

added) (citing *McClain v. Bowen*, 848 F.2d 892, 894 (8th Cir. 1988)).

Here, there is no evidence in the record that Plaintiff had a severe impairment

related to his neck from April 2011 through December 31, 2011.  It was not until April

2012, based on the available evidence, that Plaintiff presented to a doctor for any neck

pain.  (R. 524.)  Indeed, in December 2012, Plaintiff represented that his cervical pain

was a new condition over the past year with a flare-up occurring while moving his ladder

in approximately October 2012.  (R. 238.)  While Plaintiff ultimately had surgery on his

neck in October 2013 (R. 78-80), there is no evidence supporting the assertion of a severe

impairment to his neck in 2011.  Indeed, Plaintiff represented to a medical provider that

his "[p]ain in neck and arm first started in 2012, no inciting incident" (R. 151), and PA

Luther, a treating provider, made no mention of a disabling neck condition until

November 2012.  (R. 545.)

For all of the reasons stated above, the Court concludes that the ALJ's decision

that Plaintiff's neck ailment was not a severe impairment during the period in which

Plaintiff was insured (April 1, 2011 to December 31, 2011) is supported by substantial

evidence in the record as a whole.

**B.     The Weight Provided by the ALJ to the Opinions of PA Luther that Plaintiff Could Not Work**

With respect to the opinions from PA Luther, the ALJ found as follows:

> Opinions from a Physician's Assistant provided on generic county forms from May, July, August, and October 25, 2011 are given little weight due to the significant improvement within 12 months from that time, consistent with his notes that the limits followed recent surgery and the notes that opinions should be reviewed in one month.  (Exhibit 2F, at pages 6, 8, 10, 12) Additionally, the final responsibility for deciding whether the claimant is "disabled" under the Social Security Act is reserved to the Commissioner, and treating source opinions on issues reserved to the Commissioner of Social Security are never entitled to controlling weight or special significance.  (SSR 96-5p, 20 CFR 404.1527(e) and 416.927(e)).

(R. 31.)

As previously stated, Plaintiff argues the ALJ erred by not giving weight to PA

Luther's opinion that he was unable to work, including on the basis that Luther was a PA.

The Social Security Regulations state that "[t]reating source means your own

physician, psychologist, **or other acceptable medical source** who provides you, or has

provided you, with medical treatment or evaluation and who has, or has had, an ongoing

treatment relationship with you."  20 C.F.R. § 404.1502 (emphasis added).  Thus, the

definition of "treating source" itself recognizes that medical sources that are not "acceptable" cannot be a "treating source." The Eighth Circuit has similarly recognized that other medical sources are not treating sources, unless associated with an acceptable medical source. *See Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006) ("Mr. Cline was not a treating source as defined in the regulations, nor was he associated with a physician, psychologist, or other acceptable medical source that could potentially give him treating source status.") (citing *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003) (giving treating source status to the group of medical professionals, including therapists and nurse practitioners who worked with claimant's psychologist, where the treatment center used a team approach); *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1037 (9th Cir. 2003) (noting that "the use of a team approach by medical providers [wa]s analytically significant" in *Shontos*'s application of the treating source regulations."). For social security benefits applications filed prior to March 27, 2017, which was the case here, the term "acceptable medical sources" does not include PAs, but was limited to "[l]icensed physicians (medical or osteopathic doctors)" in addition to a few specialized categories. 20 C.F.R. § 404.1513(a) (2016). A PA is considered an "other" medical source, i.e., not an acceptable medical source, for such benefits applications. *See id.* § 404.1513(d) ("Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, **physicians' [sic] assistants**, naturopaths, chiropractors, audiologists, and therapists)" (emphasis added)). Consequently, PA Luther is not considered a "treating source" and is not entitled the deference due a treating source under the regulations.

More importantly, the opinions between May 2011 and October 2011 from PA Luther amounted to him checking a box representing that "Patient will not be able to perform any employment in the foreseeable future." (R. 537-44.) "[T]reating source opinions on issues that are reserved to the Commissioner **are <u>never</u> entitled to controlling weight or special significance**. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96-5P, 1996 WL 374183, at *2 (emphasis added); *see also Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009) (quoting 20 C.F.R. §§ 416.927[e](1), (3)) (citation omitted) ("[A] treating physician's opinion that a claimant is 'disabled' or 'unable to work,' does not carry 'any special significance,' because it invades the province of the Commissioner to make the ultimate determination of disability."). Indeed, the Eighth Circuit has held that "[a] treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." *See House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) (citing *Krogmeier v. Barnhart*, 294 F.3d 1019, 1023 (8th Cir. 2002)).

Therefore, the Court finds that the ALJ did not err by not giving great weight to PA Luther's opinions that Plaintiff was unable to work.

**C.**     **Whether the ALJ's RFC Relating to the Limitations Caused by Plaintiff's Back Impairments is Supported by Substantial Evidence**

Defendant argues that Plaintiff is not entitled to disability benefits for impairments related to his back because he failed to show a limitation lasting longer than twelve months.  Plaintiff asserts that his degenerative disk disease is an ongoing problem and ALJ's decision is flawed because she failed to consider the whole picture of the progression of his disease.  (Dkt. 24 at 3.)  With respect to Plaintiff's back limitations, the ALJ found as follows:

> In summary, these records indicate that, during the relevant period, the claimant did have two surgeries, to address symptoms beginning in April 2011.  However, by December 2011, within 12 months and not extending past the date last insured, the claimant had recovered from the surgeries, denied problems with pain and weakness, and did not exhibit any limitations on physical examination.  An MRI study in April 2012, with a new occurrence of pain in connection with new neck pain, showed stable findings with the post-surgical changes and no evidence of nerve root involvement. (Exhibit IF, at pages 15-16, See Exhibit 4F, at page 10)  In April 2013, when he complained of left leg weakness, he showed a normal gait and intact neurological function. (Exhibit 4F, at page 11)  The first time he showed changed findings was in April 2014. (Exhibit 4F, at page 20).

(R. 30.)  The ALJ also noted that there were "no new records from the relevant time period that supported greater limitations related to the back impairment."  (R. 31.)  In addition, the RFC considered Plaintiff's work history (the fact that Plaintiff had stopped working when his job was eliminated) and his daily activities (including mowing the lawn).  (R. 31-32.)

"A disability claimant has the burden to establish her RFC."  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id.* (quoting *Lauer v.*

*Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526–27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).

An ALJ should consider several factors, in addition to the objective medical evidence, in assessing a claimant's subjective symptoms, including daily activities; work history; intensity, duration, and frequency of symptoms; any side effects and efficacy of medications; triggering and aggravating factors; and functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *5-7 (S.S.A. Mar. 16, 2016) (listing these factors as relevant in evaluating the intensity, persistence, and limiting effects of a person's symptoms). But the ALJ need not explicitly discuss each factor. *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005).

Here, the medical evidence relating to Plaintiff's back impairment supports the ALJ's light RFC for Plaintiff. There is no dispute that Plaintiff reported to urgent care clinic on April 1, 2011 with back pain that culminated in an April 22, 2011 surgery for left L5-S1 herniated nucleus pulposus and left S1 radiculopathy. (R. 39-40, 43-44, 166.) No limitations were put into place for Plaintiff except to "mobilize as tolerated." (R. 44.) The record is devoid of any contact with medical providers for his back until

approximately four months later in August 2011, and even Plaintiff himself represented that he had been doing well since his surgery until a few weeks prior to his visit when he started to have recurrent low back pain.  (R. 48, 55.)  Dr. Santos characterized Plaintiff's back problems as a "mild picture."  (R. 48.)  Ultimately, revision surgery on Plaintiff's back was required.  (R. 52-53.)  After Plaintiff's October 22, 2011 surgery, Dr. Santos provided a post-surgical temporary limitation on Plaintiff of no more than 10 pounds and no repetitive bending or twisting for six weeks (through the first week of December 2011).  (R. 52-53)  The ALJ properly discounted the temporary restriction, especially given Plaintiff's level of recovery prior to the last date he was insured.  *See Espinoza v. Berryhill*, No. 18-CV-00315-MEH, 2018 WL 3829956, at *8 (D. Colo. Aug. 13, 2018) ("[T]he ALJ noted that this was a temporary restriction, which has little relevance to Mr. Espinoza's 'overall ability to function on a daily basis.'  I agree with the ALJ that limited and temporary restrictions generally receive less weight.") (citations omitted); *see also* 42 U.S.C. § 423(d)(1)(A) (stating that an impairment must be expected to last at least twelve months).

As of December 13, 2011, Dr. Brehmer and Dr. Santos examined Plaintiff and reported that he was doing well, he denied having any issues with pain, denied any radicular symptoms, denied any weakness in the lower extremities, and denied any numbness or tingling.  (R. 61.)  The radiography showed normal alignment and only mild degenerative disk disease.  (R. 61-62.)  The doctors' assessment for Plaintiff was that he was clinically doing well and that "he can be doing activities as tolerated and we can see him back in clinic on an as needed basis."  (R. 62.)  Plaintiff sought no further care for his

back through the date of last insured.  It was not until April 2012 that Plaintiff sought any medical attention for his back, and even then, Dr. Ghose only noted some tenderness along his spine on palpation, but no pain with straight leg raising.[9]  (R. 525.)  Plaintiff also had normal strength, and a grossly intact sensation.  (*Id.*)  Radiography on Plaintiff's back only showed a prior lumbar surgery and the MRI showed no evidence of a residual disk herniation.  (R. 525, 531.)  Other than complaining about a flare-up of back pain to a therapist after shoveling snow in February 2013, there was no mention of any limitation to Plaintiff's functioning as it relates to his back until April 2014, over two years after the date Plaintiff was last insured, when he asserted he had been having increasing low back pain "as of late," apparently after shoveling snow and doing plumbing work.  (R. 104, 248.)  Moreover, there was no evidence during the relevant time period that Plaintiff needed to get up and walk about during the workday or otherwise rest.  The medical evidence, or lack thereof, coupled with Plaintiff's representations regarding working after the December 2011 surgery (R. 317), being able to walk a quarter-mile (R. 319), going grocery shopping (R. 475), and mowing his yard (even in 2014) (R. 474), leads the Court to find that substantial evidence in the record as a whole supports the ALJ's exertional RFC during the relevant period in question.

---

[9]     While flexion and extension were decreased, it was unclear whether this related to Plaintiff's neck, back, or both.

**D.     Whether Plaintiff Was Able to Perform His Past Work During the Relevant Time Period**

During the hearing before ALJ, Plaintiff represented to the VE that as part of his past positions as a telemarketer and phone order clerk he "could sit or stand but could not walk around" and performed "a lot of" keyboarding.  (R. 326-27.)  The VE went on to testify that the telemarketer and phone order clerk positions were sedentary and unskilled.  (R. 327.)  The ALJ propounded to the VE the following hypothetical:

> I'm going to ask you some hypothetical questions and I want you to assume for the purposes of these questions that during the relevant period, we had an individual who is 47 years of age.  So a younger individual, with the equivalent of a high school education and work experience as described in you [sic] report and as modified by your testimony and during that period of time, this individual was impaired by a combination of impairment [sic] such that in the first hypothetical question this individual would have been capable of light work exertionally; lifting up to 20 pounds occasionally, 10 pounds frequently; six hours of walking or standing; two hours of sitting in an eight-hour workday; that would be further limited by no more than occasional bending, stooping, kneeling, crouching, crawling or climbing and should not involve exposure to high concentrations of air pollutants.  Given those limitations first of all could this individual perform any of the jobs done by the Claimant in the past?

(R. 329.)

The VE responded that a person with those limitations could perform the telemarketer and the phone order clerk positions, and that these positions could accommodate intermittent typing.  (R. 328-29.)  While the positions could accommodate alternating between sitting and standing, as validated by Plaintiff, the VE noted that walking away from the work area to relieve any symptoms would be problematic,

including if it would take him off task for 15% of the day.[10]  (R. 326, 330-31.)  The VE

went on to testify that the information he provided was consistent with the Dictionary of

Occupational Titles, as well as his own experience as a vocational counselor.  (R. 330.)

     "[A] claimant is not disabled if he retains the RFC to perform . . . the actual

functional demands and job duties of a particular past relevant job."  *Wagner v. Astrue*,

499 F.3d 842, 853 (8th Cir. 2007) (citing *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir.

1996); SSR 82-61); *see also Lowe v. Apfel*, 226 F.3d 969, 973 (8th Cir. 2000) ("Where

the claimant has the residual functional capacity to do either the specific work previously

done or the same type of work as it is generally performed in the national economy, the

claimant is found not to be disabled.").  The ALJ may take testimony from a vocational

expert to evaluate whether a claimant is capable of performing past relevant work.

*Wagner*, 499 F.3d. at 853-54 (citing 20 C.F.R. § 404.1560(b)(2)) ("We may use the

services of vocational experts or vocational specialists . . . to obtain evidence we need to

help us determine whether you can do your past relevant work, given your residual

functional capacity.").  To this end, a claimant is not disabled if he can perform either

"[t]he actual functional demands and job duties of a particular past relevant job" or "[t]he

functional demands and job duties of the occupation as generally required by employers

throughout the national economy."  *Id.*; *see also Samons v. Astrue*, 497 F.3d 813, 821

(8th Cir. 2007) (citing *Martin v. Sullivan*, 901 F.2d 650, 653 (8th Cir. 1990)) ("An ALJ

---

[10]    There is no reference to a 15% disability in the VE's testimony as asserted in
Plaintiff's brief.  Thus, the Court assumes that Plaintiff was referring to this testimony
from the VE in response to his attorney's questioning about the hypothetical if the person
was off task 15% of the workday.

may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as [ ] he actually performed it or as generally required by employers in the national economy."); 20 C.F.R. § 404.1560(b)(2).

"A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). A hypothetical question need only include the impairments and limitations that the ALJ finds are credible and substantially supported by the record as a whole. *See Scott v. Berryhill*, 855 F.3d 853, 857 (8th Cir. 2017) (a properly phrased hypothetical includes limitations mirroring those of claimant); *see also Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) ("The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."). The burden at step four remains with the claimant to establish that she cannot return to her past relevant work. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). Social Security Ruling 82-61 also explicitly notes the DOT "descriptions can be relied upon--for jobs that are listed in the DOT--to define the job as it is usually performed in the national economy." SSR 82-61, 1982 WL 31387, at *2. The regulations similarly note resources such as the DOT may be used to help determine whether a claimant can perform past relevant work. *See* 20 C.F.R. § 404.1560(b)(2).

Here, as set forth more fully above, the ALJ's hypothetical to the VE incorporated the impairments reflected in the light RFC, supported by substantial evidence in the

record, which did not include any requirement (as argued by Plaintiff) that he needed to rest for 15% of the time or otherwise move away from his desk. Based on the hypothetical, the VE found that such a hypothetical claimant would be able to perform the position of telemarketer and the phone order clerk. The telemarketer and phone order clerk are sedentary in nature under the DOT and the VE's testimony. Thus, substantial evidence supports the ALJ's decision that Plaintiff could perform his past relevant work.[11]

## V.    ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.      Plaintiff Daniel A.'s Motion for Summary Judgment (Dkt. 24) is **DENIED**;

2.      Defendant Commissioner of Social Security Andrew Saul's Cross-Motion for Summary Judgment (Dkt. 25) is **GRANTED**; and

3.      This case is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


DATED: September 11, 2019                    *s/Elizabeth Cowan Wright*
                                             ELIZABETH COWAN WRIGHT
                                             United States Magistrate Judge

---

[11]      The Court notes that Plaintiff's argument that no company would purchase him a sit/stand desk ignores the fact that he admitted at the hearing before the ALJ that he could sit and stand at his Best Buy position, even though he was not provided with such a desk. Moreover, Plaintiff's claims that he was not good at telemarketing has nothing to do with whether he physically could perform the work.